**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re Apollo Group, Inc. Securities Litigation, | Master File No. CV 04-2147-PHX-JAT (LEAD) |
| | CV 04-2204-PHX-JAT (Consolidated) |
| | CV 04-2334-PHX-JAT (Consolidated) |
| This Document Relates To: All Actions | CLASS ACTION |
| | **ORDER** |

      This securities-fraud class action centers around a Department of Education ("DOE") program review at the University of Phoenix ("UOP"), a wholly-owned subsidiary of Apollo Group, Inc., that began in August 2003 and ended by settlement agreement on September 7, 2004. The Policemen's Annuity and Benefit Fund of Chicago ("PABF"), representing a class of persons who purchased Apollo stock between February 27, 2004 and September 14, 2004, claimed that Apollo and two of its individual officers made false or misleading statements concerning the status of this program review, and that these misrepresentations caused certain investors to suffer economic loss after the truth was fully disclosed to the market by way of two analyst reports (the "Flynn reports") on September 20, 2004. At trial, the Court instructed the jury that loss causation, an essential element of PABF's securities-fraud claim, could be found only if the Flynn reports were "corrective disclosures." The jury found for PABF.

      Apollo and its individual officers now move for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) and, alternatively, for a new trial under Rule 59. The

1 dispositive question presented in the Rule 50(b) motion is whether the evidence at trial was
2 sufficient to support the jury's finding that the Flynn reports were corrective disclosures.
3 The Court finds that it was not, and will therefore grant the Rule 50(b) motion.

**I.     Background**

The Court recites the facts relevant to this motion consistent with the jury verdict.

On February 5, 2004, as part of its ongoing program review at the UOP, the DOE sent Apollo a program review report that preliminarily found that the UOP had violated DOE regulations. Apollo was not required to immediately disclose the report, and it chose not to do so. But on six different occasions thereafter, between February 27, 2004 and September 7, 2004, Apollo misrepresented the actual state of affairs surrounding the program review by making public statements at odds with the existence and contents of the DOE report. On September 14 and 15, 2004, the contents of the DOE report were widely disseminated for the first time through various newspapers articles, including articles in *The Wall Street Journal*, *The Arizona Republic*, and the *Chicago Tribune*. The market did not react to the disclosure of this news in any significant way. Five days later, the Flynn reports were issued. These reports downgraded Apollo's stock for various reasons, some of which PABF argued at trial were necessary to reveal the truth of Apollo's prior misrepresentations. Apollo's stock price fell significantly thereafter.

**II.    Discussion**

*A. Motion for Judgment as a Matter of Law*

The Ninth Circuit has articulated the applicable "standard of review for post-verdict motions for judgment as a matter of law ('JMOL')" as follows:

> The trial court can overturn the jury and grant such a motion only if, under the governing law, there can be but one reasonable conclusion as to the verdict. In other words, the motion should be granted only if there is no legally sufficient basis for a reasonable jury to find for that party on that issue. In ruling on a motion for JMOL, the court is not to make credibility determinations or weigh the evidence and should view all inferences in the light most favorable to the nonmoving party. The court must accept the jury's credibility findings consistent with the verdict. It must disregard all evidence favorable to the moving party that the jury is not required to believe. The

- 2 -

1 court may not substitute its view of the evidence for that of the jury.
2 *Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1283 (9th Cir. 2001)
3 (internal citations and quotations omitted).

4     To recover for securities fraud under Section 10(b) of the Securities Exchange Act of
5 1934 and Rule 10b-5 promulgated thereunder, a plaintiff must establish "'loss causation,' *i.e.*,
6 a causal connection between the material misrepresentation and the loss." *Dura Pharms.,*
7 *Inc. v. Broudo*, 544 U.S. 336, 342 (2005). One way in which the plaintiff can prove this
8 element is by showing that a corrective disclosure caused the stock price to decline.[1] *Metzler*
9 *Inv. GMBH v. Corinthian Colls., Inc.*, ___ F.3d ___, No. 06-55826, at 9267 (9th Cir. July 25,
10 2008) (stating that the market must "learn[] of and react[] to [the] fraud"); *In re Daou Sys.,*
11 *Inc.*, 411 F.3d 1006, 1026 (9th Cir. 2005); *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161,
12 175 (2d Cir. 2005); *Omnicom Group, Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 551 (S.D.N.Y.
13 2008). A "corrective disclosure" is a disclosure that reveals the fraud, or at least some aspect
14 of the fraud, to the market. *See Lentell*, 396 F.3d at 175 n.4 (holding that, to be corrective,
15 a disclosure must "reveal to the market the falsity of the prior [representations]); *Omnicom*,
16 541 F. Supp. 2d at 551 (stating that "a disclosure need not reflect every detail of the alleged
17 fraud" but "must reveal some aspect of it"). A disclosure that does not reveal anything new
18 to the market is, by definition, not corrective. *Omnicom*, 541 F. Supp. 2d at 551.

19     At trial, as at summary judgment, PABF's loss-causation theory, as articulated by its
20 expert witness, Dr. Steven P. Feinstein, depended entirely on the jury finding the Flynn

21

---

22 [1] Isolating the effect of a corrective disclosure on a stock price requires expert testimony.
23 The tool most often used by experts to isolate the effect of a corrective disclosure on a stock price is the "event study." *In re Apollo Group, Inc. Sec. Litig.*, 509 F. Supp. 2d 837, 844 (D.
24 Ariz. 2007) (citing *In re Imperial Credit Indus., Inc.*, 252 F. Supp. 2d 1005, 1014 (C.D. Cal.
25 2003)). In grossly oversimplified terms, the event study enables an expert to pinpoint any decline in the stock price attributable to market factors unrelated to the corrective disclosure.
26 Once this is accomplished, if a statistically significant price decline remains, then the expert can be reasonably certain that the corrective disclosure, and thus the fraud, caused that
27 remaining decline.

28
- 3 -

1 reports to be corrective disclosures. Apollo argues that the evidence was insufficient to
2 support such a finding for two independent reasons.

3 First, Apollo contends that a market analyst's opinion—which is all the Flynn reports
4 were—is not, and never can be, a "corrective disclosure." Apollo maintains that, to be
5 corrective, a disclosure must reveal *facts* that are necessary to correct the falsity of prior
6 misstatements or omissions, as opposed to simply *analyzing* previously disclosed facts. The
7 Court considered and rejected this argument at summary judgment, stating:

> In order to grant summary judgment to Defendants on this issue, the Court would have to conclude as a matter of law that a market professional's analysis of facts that had been previously disclosed to the investing public can *never* be a corrective disclosure. Defendants have not cited, and this Court has not found, any case that supports this proposition.

11 *In re Apollo Group, Inc. Sec. Litig.*, 509 F. Supp. 2d at 846 (emphasis added). Although it
12 appears that at least one district court has since concluded otherwise, see *Omnicom*, 541 F.
13 Supp. 2d at 552, the Court will not retreat from its prior holding. To do so, and hold
14 otherwise, would give companies the perverse incentive to indulge in opaque, piecemeal
15 disclosures, specially designed to avoid any market reaction to the news. *See In re Merck*
16 *& Co., Inc. Sec. Litig.*, 432 F.3d 261, 271 (3d Cir. 2005) (declining to hold that analysis of
17 previously disclosed facts can never be a corrective disclosure because the court did not
18 "wish to reward opaqueness"). This Court has no desire to encourage corporate
19 gamesmanship of this kind.

20 With that said, the Court's rejection of Apollo's rigid, facts-only approach to
21 corrective disclosures is not to deny that the typical securities fraud will be fully revealed
22 through the disclosure of facts, without the need for any subsequent analysis. As the *Merck*
23 court stated, "An efficient market for good news is an efficient market for bad news." 432
24 F.3d at 271. The situations in which the pertinent facts are obfuscated in such a way, or are
25 of such complexity, as to require someone to connect the dots for a bewildered market
26 represent a very rare type of securities-fraud case, and would not be the rule. The Court's
27 position simply recognizes that an efficient market is not necessarily an omniscient one.

28
- 4 -

1    Second, Apollo contends that, even accepting the premise that analysis of existing
2 facts may sometimes be necessary to reveal a fraud to the market, the Flynn reports were not
3 necessary to reveal the fraud in this case because they did not provide any new, fraud-
4 revealing analysis. The Court agrees. At trial, there were only three aspects of the Flynn
5 reports that PABF contended were corrective,[2] and the evidence was insufficient to show that
6 any one of these aspects was in fact corrective.

7    First, PABF claimed that the Flynn reports were the first to predict future regulatory
8 problems as a result of the previously disclosed contents of the DOE report. This claim,
9 however, was demonstrably false, as evidenced in particular by a *Chicago Tribune* article
10 entitled "School Fine May Foretell Crackdown," published five days before the Flynn reports
11 were issued. [Tr. Ex. 14083-R (Doc. # 559).] That article—in the context of discussing the
12 DOE's investigation of the UOP, the findings of wrongdoing contained in the DOE report,
13 and the subsequent "record fine" that resulted—reported that "leading industry executives
14 said . . . that investigations may lead to stricter regulatory control of their sector and spark
15 the interest of Congress." [*Id.*] The article also reported that Todd Nelson himself, Apollo's
16 chief executive officer at the time and one of the individual defendants in this lawsuit, "told
17 an investors conference in New York that [he was] concerned about investigations into for-
18 profit education companies" like the UOP. [*Id.*] Thus, contrary to PABF's contention at
19 trial, Flynn was not the first to tie future regulatory problems to the DOE report, and the jury
20 therefore could not properly conclude that her reports were corrective for this reason.

21    Second, PABF claimed that the Flynn reports revealed for the first time that the UOP

---

[2] Actually, PABF only explicitly argued for two corrective aspects to the Flynn reports. [Tr. 4062:20-23 ("[T]he only new information is that she has the report and she's talked to enrollment counselors. That's the only new information. There's no other information.").] But while discussing these two allegedly corrective aspects, PABF also argued that the reports were corrective because they were the first to tie future regulatory problems to the DOE report [Tr. 4059:19-4062:5], an argument also made at summary judgment, *In re Apollo Group*, 509 F. Supp. 2d at 845.

- 5 -

1  was experiencing increasing turnover among its enrollment counselors as a result of a new
2  compensation plan. This claim, however, was factually wrong. The uncontradicted evidence
3  at trial was that enrollment-counselor turnover actually decreased after the implementation
4  of the new compensation plan. [Tr. 2408:1-2411:5.] As a matter of logic, false information
5  cannot possibly be corrective information. Moreover, although PABF presented evidence
6  arguably linking the claim of increasing enrollment-counselor turnover to *the DOE report*,
7  PABF did not present any evidence linking this claim to *Apollo's misrepresentations*. Thus,
8  the jury could not properly conclude that the Flynn reports were corrective on this basis.

9  Third, PABF claimed that the Flynn reports were corrective because it was "obvious
10  from the report[s]" that Flynn had "read the [DOE] report." [Tr. 4059:1-2.] But this, of
11  course, is nonsense. What Flynn did or did not read before issuing her reports is irrelevant.
12  All that matters is what she actually disclosed to the market in her reports, and PABF has
13  conceded, as it must, that Flynn did not disclose *any* of the DOE report's contents in her
14  reports, much less any new contents.[3]  [Tr. 4059:2.]

15  Securities-fraud actions are "available, not to provide investors with broad insurance
16  against market losses, but to protect them against those economic losses that
17  misrepresentations actually cause." *Dura*, 544 U.S. at 345; *see also Basic, Inc. v. Levinson*,
18  485 U.S. 224, 252 (1988) (White, J., concurring in part and dissenting in part) (rejecting an
19  argument that "would effectively convert Rule 10b-5 into a scheme of investor's insurance").
20  The evidence at trial undercut all bases on which PABF claimed the Flynn reports were
21  corrective. Thus, although PABF demonstrated that Apollo misled the market in various

---

[3] In its opposition to Apollo's motion for judgment as a matter of law, PABF argues that two other bits of information disclosed in the Flynn reports were also corrective: (1) Flynn's statement that enrollment counselors had reported that enrollment targets were getting harder to hit; and (2) the fact that the UOP had adopted a new compensation plan. But neither bit of information was linked in any way to Apollo's prior misrepresentations. [Tr. 2170:19-2171:25.] Thus, the jury could not have found the Flynn reports to be corrective on either of these bases.

- 6 -

1 ways concerning the DOE program review, PABF failed to prove that Apollo's actions
2 caused investors to suffer any harm. Therefore, Apollo is entitled to judgment as a matter
3 of law.

*B. Motion for New Trial*

Apollo also moved in the alternative for a new trial under Federal Rule of Civil Procedure 59. The Court is required to conditionally rule on this motion in the event the appellate court reverses the grant of judgment as a matter of law. See Fed. R. Civ. P. 50(c)(1).

Rule 59(a) states that "after a jury trial," a new trial may be granted "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Reasons for granting a new trial historically include prejudicial evidentiary rulings, *Dorn v. Burlington N. Santa Fe R.R.*, 397 F.3d 1183, 1189 (9th Cir. 2005), erroneous or inadequate jury instructions, *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990), attorney misconduct, *Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 346 (9th Cir. 1995), and a verdict that, in the judge's view, is against the clear weight of the evidence (or constitutes a miscarriage of justice), *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007). Apollo maintains that all of these reasons warrant a new trial in this case.

### 1. Challenged Evidentiary Rulings

Apollo asserts three errors in the Court's evidentiary rulings.

First, Apollo argues that the Court's exclusion of Kelly Flynn's testimony as to the meaning of her reports was prejudicial, especially in light of the fact that the Court permitted PABF's expert witness, Dr. Feinstein, to testify on the same subject. The Court disagrees. The Flynn reports were admitted as evidence of what the market was told on September 20, 2004. What these reports meant *to the market* could only be gleaned from the words contained in them. Permitting Flynn to testify as to the meaning of these words would have invited the jury to determine the meaning of the Flynn reports based on the author's unspoken thoughts and intentions rather than on the words themselves. The danger of

confusion and unfair prejudice far outweighed whatever probative value such testimony may have had. See Fed. R. Evid. 403. Any testimony of the parties' loss-causation experts on the same subject simply did not present the same danger.

Apollo next argues that the Court's refusal to permit Apollo's legal advisors to testify about the "rationale" behind their legal advice was prejudicial error. Again, the Court finds no error in this evidentiary ruling. Apollo's legal advisors were permitted to testify as to the advice they actually communicated to Defendant Nelson, as evidence of Nelson's state of mind. They were also permitted to testify as to their qualifications and the professional capacity in which they rendered the advice—i.e., as lawyers with the fiduciary duty and ethical obligation to give their client the best legal advice they can—to establish why Nelson might have properly relied on their advice. But to allow Apollo's advisors to explain why they gave particular advice would have permitted these lawyers to offer what would have amounted to undesignated expert opinion on the governing law of the case, thereby invading the province of the Court and inviting jury confusion. Moreover, to the extent PABF attacked the credibility of these legal advisors by attempting to paint them as mere "highly-paid advocates," Apollo had an adequate opportunity to rehabilitate them by showing that the lawyers acted in their professional capacity, with all the ethical duties that accompany it.

Finally, Apollo argues that it was prejudicial error to allow Dr. Feinstein to testify about the *risks* of the DOE report as a proxy for the *materiality* of the report, one of the ultimate issues in the case. The Court, however, sees a meaningful distinction between, "A reasonable investor would have considered the DOE report to be material," and, "A reasonable investor would have considered the DOE report to expose certain risks." Furthermore, the fact that the Court could have permitted Dr. Feinstein to testify explicitly concerning the materiality of the report, see Fed. R. Evid. 704(a) (stating that opinion testimony is generally "not objectionable" merely "because it embraces an ultimate issue to be decided by the trier of fact"), clearly demonstrates that the Court did not err in admitting

1  this testimony.

### 2. Jury Instructions

Apollo asserts a number of errors and inadequacies in the jury instructions. But after reviewing the parties' arguments and the jury instructions as a whole, the Court is convinced that the instructions "fairly and adequately cover[ed] the issues presented, correctly state[d] the law, and [were] not misleading." *Chuman v. Wright*, 76 F.3d 292, 294 (9th Cir. 1996). The Court's reasons, as stated on the record, will speak for themselves in this regard.

### 3. Attorney Misconduct

Apollo argues that PABF's allegedly repeated references to irrelevant topics and its alleged use of a "golden rule" argument—asking the jurors to place themselves in the shoes of the class members—prejudiced its right to a fair trial. "A new trial is warranted on the ground of attorney misconduct during the trial where 'the flavor of misconduct . . . sufficiently permeate[s] an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict.'" *Anheuser-Busch, Inc.*, 69 F.3d at 346 (quoting *Kehr v. Smith Barney, Harris Upham & Co.*, 736 F.2d 1283, 1286 (9th Cir. 1984)). Although there can be no doubt that PABF succeeded in delving into some irrelevant matters early in the trial, and to the extent PABF's argument during closing can even properly be characterized as an improper "golden rule" argument,[4] the Court is not persuaded that PABF's actions tainted the entire proceeding.

### 4. Miscarriage of Justice

Finally, Apollo contends that "[t]he jury in this case returned a verdict that is a

---

[4] To determine whether *a reasonable investor* would have viewed the DOE report as material, PABF's counsel invited the jury members to ask themselves whether *they personally* would have viewed the report as material *if they were going to invest in Apollo*. [Tr. 4044:8-12 ("Read the [DOE report] and sit down and say to yourself, honestly, if I was going to invest in this company would this give me a reason to pause? Would I find that this altered, significantly altered the total mix of information in the marketplace? Would I find this to be important?").] Any error in this argument was harmless at worst.

- 9 -

miscarriage of justice." But to the extent the appellate court reverses this Court and rules that sufficient evidence supported the jury's finding that the Flynn reports were corrective disclosures, the Court is satisfied that justice was achieved, for Apollo and the class members.

In sum, none of the reasons cited by Apollo warrant a new trial in this case. Therefore, pursuant to Federal Rule of Civil Procedure 50(c)(1), the Court will conditionally deny Apollo's motion for new trial.

### III. Conclusion

The evidence at trial was insufficient to support the jury's finding that the Flynn reports were corrective disclosures. Therefore, PABF failed to prove loss causation, and Apollo is entitled to judgment as a matter of law.

For the foregoing reasons,

**IT IS ORDERED** that Apollo's Motion for Judgment as a Matter of Law (Doc. # 524) is **GRANTED**;

**IT IS FURTHER ORDERED** that Apollo's Motion for New Trial (Doc. # 523) is **DENIED**;

**IT IS FURTHER ORDERED** that, for the reasons stated on the record at the motion hearing held on August 4, 2008:

(1) PABF's Motion to Amend the Judgment (Doc. # 521) is **DENIED**;

(2) Apollo's Motion to Correct the Trial Record (Doc. # 550) is **GRANTED IN PART AND DENIED IN PART**; and

(3) Apollo's Motion for Remittitur (Doc. # 525) is **DENIED**;

**IT IS FURTHER ORDERED** that the Clerk of the Court shall vacate the judgment at Doc. # 508 and the award of costs at Doc. # 553, and shall enter judgment in favor of Defendants and against Plaintiffs.

DATED this 4th day of August, 2008.

*James A. Teilborg*
United States District Judge

- 11 -